UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

FRANCINE CLARK-WOODS,          )
                               )
          Plaintiff,           )
                               )
     v.                        )   Case No. 4:10CV1377 FRB
                               )
MICHAEL J. ASTRUE, Commissioner )
of Social Security,            )
                               )
          Defendant.           )

## MEMORANDUM AND ORDER

This cause is before the Court on plaintiff Francine Clark-Woods's appeal of an adverse ruling of the Social Security Administration. All matters are pending before the undersigned United States Magistrate Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

### I. Procedural History

On February 16, 2007, plaintiff Francine Clark-Woods ("plaintiff") filed applications for Disability Insurance Benefits (also "DIB") pursuant to Title II, and for Supplemental Security Income (also "SSI") pursuant to Title XVI, of the Social Security Act, 42 U.S.C. §§ 401, et seq. (also "Act"), alleging disability beginning December 2, 2008.[1] (Administrative Transcript ("Tr.") 87-93). Plaintiff's applications were initially denied, (Tr. 41, 43-48) and she requested a hearing before an Administrative Law

---

[1]Originally, plaintiff alleged an onset date of October 1, 2006, but amended the date because she had returned to work afterward as a certified nurse's aide. (Tr. 7, 16-17, 23-25, 107).

-1-

Judge (also "ALJ"), which was held on February 10, 2009. (Tr. 12-38). On June 29, 2009, the ALJ issued his decision denying plaintiff's claims. (Tr. 7-11).

Plaintiff sought review from defendant agency's Appeals Council which, on May 25, 2010, denied her request for review. (Tr. 1-3). The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

A. <u>Plaintiff's Testimony</u>

During plaintiff's administrative hearing, she testified that she was fifty years of age, had finished high school, and had attended trade school to become a Certified Nurse's Aide (also "CNA"). (Tr. 16).

Plaintiff testified she last worked for Rosewood Health Care, a nursing home, but stopped working in December of 2008. (Tr. 16-17). Plaintiff testified that she returned to work at Rosewood Health Care because no one in her family was working, and she needed to care for her son. (Tr. 23-24). She stated that, while working for Rosewood Health Care in December of 2008, she injured her right shoulder, neck and arm while lifting a patient, and had to stop working. (Tr. 24-25).

Plaintiff testified that she had previously worked as a CNA for Barnes Daily Care for two years, but hurt her ankle on the job and was fired in March of 2006 due to disability and health reasons. (Tr. 17-20). She testified that she had undergone surgery on her ankle. (Tr. 20-22). She testified that her ankle

surgery and subsequent therapy helped until she started walking again, and that she still had problems walking and staying on her feet. (Tr. 23, 27).

Plaintiff testified that, following her ankle surgery, she worked for Rosewood Health Care on light duty, which she defined as measuring blood pressure and temperature and distributing ice water pitchers. (Tr. 30-31). Plaintiff testified that, due to shoulder pain, she had trouble opening the tops of the water pitchers, and needed assistance. (Tr. 31). She testified that, because of her ankle, she sat down as often as possible while working light duty. (Id.) She testified that she had to "sneak" to find time to sit down beyond what she was allowed during her work breaks. (Id.) Plaintiff explained that she accomplished this by spending 15 to 20 minutes sitting down in a patient's room, talking to the patient. (Id.) She testified that she did this every time she worked. (Tr. 32).

Plaintiff testified that she worked as a CNA for several other nursing homes, and that she had worked as a CNA as far back as 1994. (Tr. 18-19). She testified that she had been employed as an assembly line worker for a short period of time "back a long time ago" when she "came out of high school."[2] (Tr. 19).

Plaintiff testified that she was currently under treatment with a Dr. Caldwell for hypertension, anxiety and depression. (Tr. 21). She stated that she could walk for no

---

[2]In a Disability Report, it is indicated that plaintiff worked as an assembly line worker for a bug spray factory from 1994 to 1995. (Tr. 127).

longer than 30 minutes. (Tr. 28). She stated that she had talked to Dr. Caldwell about her foot problems, but not about her shoulder problems because she was still under the care of a different doctor for her shoulder. (Id.) Plaintiff testified that she could not use her right shoulder, and could not lift it over her head. (Tr. 29-30). She testified that she had pain on the right side of her neck. (Tr. 30).

Plaintiff testified that her eighteen-year-old son did the household chores for her, and that she did only a few "little light things" such as hanging up her clothes and preparing boiled cabbage or other vegetables. (Tr. 33). She testified that she sat down during the cooking process. (Id.) Plaintiff testified that she did not shower because she could not stand for long, and that, when she took a bath, she had trouble getting out of the bathtub because of her legs. (Tr. 34).

Plaintiff testified that her husband and son did the grocery shopping, and that she sometimes accompanied them. (Tr. 34-35). She testified that, when she accompanied them, she sometimes walked around with the cart, but that most of the time she had to sit down. (Tr. 35).

Plaintiff testified that she could lift fewer than five or ten pounds. (Tr. 35). She stated that she spent most of her time lying down. (Id.) She testified that she had  doctor's appointments scheduled at Concentra for her neck and shoulder, and that she had undergone MRI testing. (Tr. 36).

B.  Medical Records[3]

The record reflects that plaintiff saw Reynal L. Caldwell, D.O. on April 26, 2006 and was noted to be very tearful and upset, and that she had been placed in a crisis situation from her job.  (Tr. 215).[4]  On April 28, 2006, plaintiff sought paperwork regarding taking time off work.  (Id.)  On May 16, 2006 she saw Dr. Caldwell and it was noted that she was to return to work on May 26, 2006.  (Tr. 215).

Radiological records from Barnes-Jewish West County Hospital indicate that a July 24, 2006, x-ray of plaintiff's left ankle revealed swelling, but no bone injury.  (Tr. 182).  On September 27, 2006, MRI of plaintiff's left ankle revealed an osteochondral defect in the left medial talar dome, joint chondrosis, and effusion.  (Tr. 180).

On October 3, 2006, plaintiff saw Brett Grebing, M.D., of the Orthopedic Surgery department at Washington University Medical Center with complaints of left ankle pain.  (Tr. 198-200).  Plaintiff complained of a ten-month history of left ankle pain and swelling and denied a specific injury, but stated that she was working, which required her to stand on her foot for eight hours per day. (Tr. 198).  Plaintiff described pain radiating across the ankle joint to the lateral side, worse when standing.  (Id.)  Dr. Grebing noted that plaintiff had a normal mood and affect, and an

_____

[3]The following summary includes medical information dated outside the relevant time period.

[4]Dr. Caldwell's records are largely illegible and contain little more than descriptions of plaintiff's reported symptoms.

intact memory. (Id.) He noted that plaintiff's neck was supple and not tender, and had adequate range of motion. (Id.) Plaintiff's knee and ankle reflexes were normal. (Tr. 199). Plaintiff's left ankle was swollen and tender, plaintiff could not do a single toe raise, and her strength was described as "weak at 4-/5." (Id.) Dr. Grebing noted that x-rays showed good alignment and minimal degenerative change, and that MRI showed a type I osteochondral lesion and posterior tibial tendon inflammation, and fluid consistent with a flat foot deformity. (Id.) Dr. Grebing diagnosed flat feet, left posterior tibial tendinitis, and a left talar osteochondral lesion. (Id.) Dr. Grebing performed an injection and recommended "aggressive physical therapy" and the use of an orthotic, and advised plaintiff to return in one month. (Tr. 199).

Plaintiff returned to Dr. Grebing on October 31, 2006 and reported complying with physical therapy, but stopping the use of the orthotic on the advice of the physical therapist. (Tr. 196). Plaintiff reported feeling "20-30% better" in terms of pain, but still had pain with standing and activity, and pain at bedtime. (Id.) Upon examination, Dr. Grebing noted left ankle swelling and weak strength, and advised plaintiff to continue physical therapy. (Id.) Dr. Grebing noted that plaintiff had been trying to arrange with her employer to work either light duty or to be off work. (Id.) Dr. Grebing wrote, "[s]he would need a position where she can be off of her feet at least 50% of the time and limit her standing to any one time to an hour until this gets better. I do

think this is a condition that was exacerbated by her work with standing." (Tr. 196-97).

Plaintiff returned to Dr. Grebing on January 5, 2007 and reported having good relief of symptoms following the ankle injection, but that the symptoms had returned over the past one to two weeks. (Tr. 194). She had ankle pain which was worse with weight bearing, and that improved with rest. (Id.) Upon examination, Dr. Grebing noted crepitation and tenderness in plaintiff's ankle, and noted that she could do a single toe raise and that she had full strength. (Id.) Dr. Grebing noted that plaintiff had to either accept her limitations or proceed with surgery for flat foot and tibial tendon reconstruction, and plaintiff was to consider these options. (Tr. 195).

Plaintiff returned to Dr. Grebing on January 23, 2007 and stated that she had experienced an increase in pain. (Tr. 192). Dr. Grebing wrote, "[s]he is having difficulty with working. She would like to get all of this taken care of." (Id.) X-rays of plaintiff's left ankle and foot performed on this date revealed mild joint degenerative changes but no acute fractures, dislocations, or joint effusion. (Tr. 178). Plaintiff elected to proceed with surgery, which Dr. Grebing performed on February 12, 2007 at Barnes Jewish West County Hospital. (Tr. 192, 204-06). The record reflects that plaintiff saw Dr. Grebing in post-operative follow-up on February 23, 2007 and March 14, 2007, and was noted to have good alignment and healing, and was placed in a non weight-bearing cast. (Id.) On February 23, 2007, x-ray of

-7-

plaintiff's left foot revealed that she had undergone surgical correction for a collapsed arch, and had not sustained a stress fracture. (Tr. 176).

Plaintiff returned to Dr. Grebing on April 6, 2007 and April 27, 2007 and had no interim complaints, was wearing her cast, and was to transition to a weight-bearing boot. (Tr. 245-52). She returned on June 1, 2007 and was advised to remain off work for one month, (Tr. 242), and returned again on June 27, 2007 and complained of foot swelling and mild pain which was worse at the end of the day. (Tr. 238). Dr. Grebing recommended that, as plaintiff progresses in physical therapy, she should return to work part-time in a light duty position, and that she should be able to return fully without restriction in two months. (Tr. 238-39).

Plaintiff returned to Dr. Grebing on August 8, 2007 and reported having finished physical therapy. (Tr. 232). She reported mild complaints of swelling, but essentially no pain, and no numbness or tingling. (Id.) Dr. Grebing released plaintiff to return to work full duty as tolerated, and released her from his care. (Tr. 233).

On June 12, 2008 plaintiff was seen in the Emergency Room of Northwest Healthcare with complaints of diarrhea, abdominal pain and nausea since eating a meal at a restaurant. (Tr. 307-25). She was diagnosed with gastroenteritis, treated, and released. (Id.) She returned on September 12, 2008 with complaints of a rash, (Tr. 300-05), and was diagnosed with hypertension. (Tr. 306). She returned on December 2, 2008 with complaints of feeling

-8-

stressed out at work, and complained of dizziness, headache, right arm tightness and right-sided chest pain. (Tr. 282, 286). Chest x-ray was negative. (Tr. 292). It was opined that her chest pain was unrelated to her heart, (Tr. 296), and that she had experienced an anxiety attack. (Tr. 297). The record indicates that plaintiff also saw Dr. Caldwell and reported anxiety attacks. (Tr. 331).

On December 21, 2008, plaintiff was seen at St. John's Hospital with complaints of right arm injury and pain secondary to lifting a heavy patient at work, and was diagnosed with muscle strain. (Tr. 339, 346).

On January 12, 2009, plaintiff was seen at Concentra Medical Centers ("Concentra") by Mary K. Jackson, N.P. and was diagnosed with a shoulder strain, cervical radiculopathy and cervical strain. (Tr. 367-68). Plaintiff returned to Concentra on January 23, 2009 and saw Boris Khariton, M.D., and reported being injured on the job on December 21, 2008 while transferring a patient from bed to a wheelchair. (Tr. 365). She complained of pain in her right shoulder and posterior neck; stated that she had been on light duty at work; and reported that it was very painful to move her arm past 60 - 70 degrees in any direction. (Id.) She noted intermittent pain radiating from her shoulder and neck down to her right arm and occasionally to her hand. (Id.) She reported taking a muscle relaxant and medication for hypertension. (Id.) Upon examination, she had mildly limited range of motion of the cervical spine and 70 to 75 degrees of flexion and abduction in her shoulder, stating that moving farther than that caused severe pain.

(Tr. 366). She had good range of motion in the right elbow, wrist and fingers, and symmetrical reflexes. (Id.) Dr. Khariton recommended MRI evaluation. (Id.)

MRI of plaintiff's cervical spine, performed on January 30, 2009, revealed moderate to large disc herniation centrally and towards the left at C5-6 with a moderate sized central disc herniation at C6-7, and a smaller right-sided disc protrusion at C7-T1 without definite root impingement. (Tr. 359). MRI of plaintiff's right shoulder, performed on this same date, revealed a 1 centimeter rotator cuff tear, "probably with some impingement by acromioclavicular spurring." (Tr. 360).

Plaintiff returned to Dr. Khariton on February 6, 2009 and reported no change in symptoms since her last visit, and her examination was largely the same. (Tr. 361). Dr. Khariton noted plaintiff's MRI results, and referred plaintiff to Dr. Kostman, an orthopedic specialist, for evaluation of her right shoulder. (Tr. 361-62). Dr. Khariton also wrote that, due to the "significant findings" revealed on MRI of plaintiff's cervical spine, she should be seen in consultation by Dr. Samson, and orthopedic spine specialist. (Tr. 362). Dr. Khariton prescribed Soma.[5] (Id.)

On February 11, 2009, plaintiff was seen at US MedGroup by Barry Samson, M.D. (Tr. 356-58). Plaintiff complained of neck and right shoulder pain secondary to her December 21, 2008 injury,

_____

[5] Soma or Carisoprodol, a muscle relaxant, is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682578.html

and Dr. Samson noted that she had undergone physical therapy, which had provided only temporary relief. (Tr. 356). It was noted that plaintiff was taking Soma, Quinapril,[6] and an antidepressant. (Id.) Plaintiff reported pain in her right shoulder, trouble sleeping on her right side, and being bothered by cold weather, lifting, cooking, and housework. (Id.) Upon examination, Dr. Samson noted tenderness in the right shoulder but no spasm, unrestricted range of motion of the neck, and restricted right shoulder motion. (Tr. 357). Abduction on the right to 90 degrees caused right shoulder pain, while there were no such findings relative to the left shoulder. (Id.) Plaintiff's grip strength was normal, and she had no pain on straight leg raise testing. (Id.) Dr. Samson noted plaintiff's MRI findings, and diagnosed her with a right rotator cuff tear and cervical spondylosis. (Id.) Dr. Samson noted that plaintiff's cervical MRI findings revealed left-sided findings, and therefore did not correlate with her right-sided symptoms. (Tr. 357).

On February 12, 2009, plaintiff returned to US MedGroup and saw Chris Kostman, M.D. (Tr. 369-70). Plaintiff described right shoulder and right-sided neck and trapezius discomfort that was exacerbated by lifting and pulling. (Tr. 369). She was working on limited duty. (Id.) Upon examination, plaintiff's shoulder musculature was equal and symmetric, and she had no cervical spine, thoracic or lumbar spine tenderness, but was tender

---

[6]Quinapril, is used to treat hypertension.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692026.html

over her right trapezius. (Id.) She had some right-sided clavicular tenderness and AC joint tenderness, limited range of motion and weakened rotator cuff strength, and a positive impingement sign. (Tr. 369-70). Dr. Kostman's impression was rotator cuff tear. (Tr. 370). Dr. Kostman noted that he and plaintiff discussed her treatment options, and that plaintiff indicated she wished to proceed with right shoulder arthroscopy. (Id.)

### III.   The ALJ's Decision

The ALJ determined that plaintiff had the severe impairments of cervical disc herniation and right rotator cuff tear, and that plaintiff's allegations of depression were "dismissed for want of a medically determinable impairment." (Tr. 9). The ALJ determined that plaintiff's "condition has not met or medically equaled a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1525, 404.1526, 416.925 and 416.926)." (Tr. 10). The ALJ determined that, "[w]ithin twelve months of December 2, 2008, the claimant is expected to have the residual functional capacity to lift or carry twenty pounds occasionally and ten pounds frequently, sit six hours in an eight-hour day, and stand and/or walk a total of six hours in an eight-hour day. This constitutes a full range of light work." (Id.)

For his RFC and credibility determinations, the ALJ wrote as follows:

> In making this finding, the undersigned
> considered symptoms and the extent to which
> they can reasonably be accepted as consistent

-12-

with the objective medical evidence and other evidence, based on the requirements of 20 C.F.R. 404.1529 and 416.929 and SSRs 96-4p and 96-7p.

The claimant testified that she has been unable to work because she has been unable to raise her right arm overhead. She asserted she has to lie down during the day due to pain.

The medical evidence does not support a finding of disability. It shows that the claimant began to complain of right arm pain in December 2008, while medical images of her right shoulder and arm showed a tear at the insertion of the supraspinatus tendon, moderate-to-large disc herniation at C5-6 and a moderate-sized disc herniation at C6-7, as well as a small disc protrusion at C7-T1 (Exhibits 7F/4; 8F/5-6). Moreover, the claimant demonstrated positive impingement and Hawkins signs on exam (Exhibit 8F/16). Yet, the most recent exam of record, performed by a physician at Concerta Medical Center in February 2009, did not demonstrate any deficits or abnormalities other than tenderness about her right shoulder, 4/5 rotator cuff strength and decreased shoulder range of motion (Exhibit 8F/15). And these conditions are expected to improve because the medical record reflects that the claimant elected to undergo shoulder surgery (Exhibit 8F/16).

The claimant also lacks credibility. As for activities of daily living, she testified that she grocery shops in spite of her right upper extremity condition. This evidence indicates a good ability to lift, carry and handle objects. Regarding intensity and frequency of symptoms, no physician imposed restrictions on the claimant, let alone considered her disabled. With respect to other factors, the claimant alleged disability because of her ankle condition, but then worked in spite of it.

(Id.)

The ALJ determined that, within twelve months of plaintiff's alleged onset date, she could perform her past relevant work as a small products assembler. (Tr. 10). He concluded that plaintiff was not disabled within the meaning of the Act. (Tr. 11).

## IV.  Discussion

To be eligible for benefits under the Social Security Act, plaintiff must prove that she is disabled. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant

is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities.  If the claimant's impairment(s) is not severe, then she is not disabled.  The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work.  If so, the claimant is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy.  If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks

and citation omitted).  "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis." Id. (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.  The credibility findings made by the ALJ.

2.  The plaintiff's vocational factors.

3.  The medical evidence from treating and consulting physicians.

4.  The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.  Any corroboration by third parties of the plaintiff's impairments.

6.  The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision.  Coleman, 498 F.3d at 770; Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole.  Pearsall, 274 F.3d

at 1217 (citing <u>Young v. Apfel</u>, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." <u>Weikert v. Sullivan</u>, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); <u>see</u> <u>also</u> <u>Jones ex rel. Morris v. Barnhart</u>, 315 F.3d 974, 977 (8th Cir. 2003).

In the case at bar, plaintiff argues that the ALJ's residual functional capacity determination is inconsistent with the standards established by the Eighth Circuit in <u>Singh v. Apfel</u>, 222 F.3d 448, 451 (8th Cir. 2000) and <u>Lauer v. Apfel</u>, 245 F.3d 700, 704 (8th Cir. 2001), inasmuch as the ALJ failed to point to "some" medical evidence to support his findings. Plaintiff notes the ALJ's observation that, when plaintiff was examined in February 2009, she demonstrated no deficits or abnormalities other than tenderness about her right shoulder, 4/5 rotator cuff strength and decreased right shoulder motion, but that these conditions were expected to improve because the medical records reflected that plaintiff elected to undergo shoulder surgery. Plaintiff complains that the ALJ failed to cite any medical evidence to support the conclusion that plaintiff's impairments would improve within twelve months of onset. Plaintiff also contends that the ALJ appeared to have ignored evidence that plaintiff had herniated discs in her cervical spine.

Plaintiff also argues that the ALJ's decision that plaintiff could return to her past relevant work is inconsistent

with the Eighth Circuit's decision in <u>Pfitzner v. Apfel</u>, 169 F.3d 566, 568 (8th Cir. 1999), inasmuch as the ALJ failed to conduct a function-by-function analysis of plaintiff's past work and failed to make explicit findings regarding the mental demands of plaintiff's past work, and instead simply cited the Dictionary of Occupational Titles (also "DOT") to show the physical demands of her past work. In response, the Commissioner contends that the ALJ's decision is supported by substantial evidence on the record as a whole.

      A.   <u>Credibility Determination</u>

Although plaintiff herein does not directly challenge the ALJ's credibility determination, she does challenge the ALJ's RFC determination, as discussed, <u>infra</u>. Because the ALJ must first evaluate a claimant's credibility before determining her RFC, <u>Tellez v. Barnhart</u>, 403 F.3d 953, 957 (8th Cir. 2005), the undersigned now examines the ALJ's credibility determination.

Testimony regarding pain is necessarily subjective in nature, as it is the claimant's own perception of the effects of her alleged impairments. <u>Halpin v. Shalala</u>, 999 F.2d 342, 346 (8th Cir. 1993). Because of the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect. <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1321-22 (8th Cir. 1984). In <u>Polaski</u>, the Eighth Circuit addressed this difficulty and set forth the following standard:

The absence of an objective medical basis

which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; (5) functional restrictions.

Id. at 1322.

Although the ALJ may not accept or reject the claimant's subjective complaints based solely upon personal observations or upon the lack of objective medical evidence, the ALJ may discount them if there are inconsistencies in the evidence as a whole. Id.; see also Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008) (the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence). The "crucial question" is not whether the claimant experiences symptoms, but whether her credible subjective complaints prevent her from working. Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003). The ALJ is not required to discuss each Polaski factor as long as "he acknowledges and considers the factors before discounting a claimant's subjective complaints." Moore v. Astrue, 572 F.3d 520, 524 (8th Cir. 2009) (citing Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005)); see also Samons v. Apfel, 497 F.3d 813, 820 (8th Cir. 2007) (citing Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) (while the Polaski factors should be taken into

account, "we have not required the ALJ's decision to include a discussion of how every Polaski 'factor' relates to the claimant's credibility.") "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, we will normally defer to the ALJ's credibility determination." Juszczyk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008); see also Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). The credibility of a claimant's subjective complaints is primarily for the ALJ to decide, and this Court considers with deference the ALJ's decision on the subject. Tellez, 403 F.3d at 957.

As quoted above, the ALJ in this case cited the Regulations and Social Security Rulings corresponding with Polaski and credibility determination, and discredited plaintiff's allegations of disabling symptoms. The ALJ did not list all of the Polaski factors, but did write that he had considered activities of daily living, the intensity and frequency of symptoms, and one "other" factor, that being the fact that plaintiff had alleged disability due to her ankle condition but nonetheless returned to work. (Id.) Having reviewed the ALJ's credibility determination in light of the record as a whole, the undersigned concludes that it is not supported by substantial evidence on the record as a whole.

For part of his credibility determination, the ALJ wrote that plaintiff "testified that she grocery shops in spite of her right upper extremity condition. This evidence indicates a good ability to lift, carry and handle objects." (Id.) This finding is

not supported by the record.   During plaintiff's administrative

hearing, she and her attorney had the following exchange:

> Question
> (by counsel):   Do you do the grocery shopping?
>
> Answer
> (by plaintiff): No, he do.
>
> Q:        Who's he?
>
> A:        My husband, David Woods.
>
> Q:        Do you ever go with him?
>
> A:        I'll go with him, but he'll be doing the
> shopping, and my son.  And they do the shopping.
>
> Q:        So you – –
>
> A:        I lot of time, I tell them to go on his own.
> I don't feel like going.
>
> Q:        Okay.
>
> A:        And they'll go.
>
> Q:        But when you go with them, do you walk around
> with the – – with them, with the cart?
>
> A:        A lot of time, I, I be trying to, but I will
> sit, and they – – I be sitting down (INAUDIBLE) they be
> gone a long time, I tell them to go, you know.  But if I
> do, I try.  My legs get tired and wear out.
>
> (Tr. 34-35).

Nothing in plaintiff's testimony concerning grocery

shopping supports the ALJ's finding that plaintiff "grocery shops

in spite of her right upper extremity condition" and that this

evidence "indicates a good ability to lift, carry and handle

objects." (Tr. 10).  Plaintiff testified that her husband and son

did the grocery shopping and that, on the occasions she accompanied

them, she tried to walk along with the cart, but often sat down.

Nothing in plaintiff's testimony indicates that she lifts, carries, or handles anything on the occasions she accompanies her husband and son to the grocery store. The ALJ's findings regarding plaintiff's activities of daily living are therefore not supported by substantial evidence on the record as a whole.

In further support of his decision to discredit plaintiff's allegations of disabling symptoms, the ALJ wrote, "[w]ith respect to other factors, the claimant alleged disability because of her ankle condition, but then worked in spite of it." (Id.) The ALJ did not explain how this factor impacted his credibility determination. The ALJ is, however, specific that he is referring to plaintiff's claim due to her ankle condition. As noted above, plaintiff subsequently amended her date of onset and included claims of disability due to her right shoulder and depression. Because the ALJ did not explain his rationale, the undersigned cannot determine whether the ALJ was referring to plaintiff's claims before or after she amended her date of onset. This, combined with the fact that the ALJ's entire credibility determination was very brief and conclusory, and the fact that his consideration of plaintiff's daily activities was not supported by the record, undermines the undersigned's confidence in the ALJ's reliance on this factor. The undersigned therefore cannot confidently say that the ALJ properly considered it, or that it supports the ALJ's adverse credibility determination.

Absent the foregoing two factors, the only other factor indicated in the ALJ's credibility analysis is that no physician

imposed restrictions on plaintiff or considered her disabled. While this is an appropriate factor for an ALJ to consider in credibility determination, See Gregg v. Barnhart, 354 F.3d 710, 713 (8th Cir. 2003), it alone cannot constitute substantial evidence to support an adverse credibility determination. See Mouser, 545 F.3d at 638 (the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence). While the undersigned recognizes that an ALJ is not required to discuss each and every Polaski factor, see Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004), the ALJ in this case not only failed to include in his decision enough good reasons to support his adverse credibility determination, he appeared to rely very heavily upon reasons that are either unsupported by the record or inadequately explained. The undersigned therefore concludes that the ALJ erroneously discredited plaintiff's subjective complaints.

     B.   <u>RFC Determination</u>

     The ALJ in this case determined that, "[w]ithin twelve months of December 2, 2008, the claimant is expected to have the residual functional capacity to lift or carry twenty pounds occasionally and ten pounds frequently, sit six hours in an eight-hour day, and stand and/or walk a total of six hours in an eight-hour day. This constitutes a full range of light work." (<u>Id.</u>) Plaintiff argues that the ALJ failed to cite any medical evidence to substantiate that plaintiff's impairments would improve within twelve months of onset, and failed to articulate a rationale regarding the herniated discs in her cervical spine. For the

following reasons, plaintiff's argument is well-taken.

Residual functional capacity is defined as that which a claimant remains able to do despite her limitations. 20 C.F.R. §§ 404.1545, 416.945; Lauer, 245 F.3d at 703. The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question" that must be supported by some medical evidence in the record; accordingly, the ALJ should ensure that the record contains medical evidence that addresses the claimant's ability to function in the workplace. Lauer, 245 F.3d at 703-04 (internal citations omitted). The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations. 20 C.F.R. §§ 404.1545(a), 416.945(a); Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995); Goff, 421 F.3d at 793. Although an ALJ must determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. Pearsall, 274 F.3d at 1217; McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). It is the claimant's burden to establish her RFC. See Masterson v. Barnhart, 363 F .3d 731, 737 (8th Cir. 2004).

The ALJ's erroneous credibility determination is but one of the flaws that renders his RFC determination legally insufficient. In his brief RFC determination (as quoted in full, supra), the ALJ noted the imaging results relative to plaintiff's

shoulder and cervical spine (which showed a right rotator cuff tear and herniated discs in plaintiff's cervical spine), and wrote "[y]et the most recent exam of record, performed by a physician at Concerta Medical Center in February 2009, did not demonstrate any deficits or abnormalities other than tenderness about her right shoulder, 4/5 rotator cuff strength and decreased shoulder range of motion (Exhibit 8F/15). And these conditions are expected to improve because the medical record reflects that the claimant elected to undergo shoulder surgery (Exhibit 8F/16)."

First, in light of the fact that plaintiff had undergone medical examination and radiological study and been diagnosed with a rotator cuff tear, shoulder tenderness and a decrease in strength and range of motion of the shoulder are not insignificant findings, as the ALJ appeared to have concluded. Instead, these findings are consistent with plaintiff's diagnosis of a torn rotator cuff, and are also consistent with her hearing testimony that she suffered pain and could not lift or raise her arm overhead.

The ALJ also relied upon his observation that plaintiff had elected to undergo shoulder surgery and that her conditions would therefore be expected to improve. The ALJ's conclusion that plaintiff's condition would improve with surgery is speculation, and therefore cannot serve as substantial evidence to support the ALJ's RFC determination. "Speculation is, of course, no substitute for evidence, and a decision based on speculation is not supported by substantial evidence." <u>White ex rel. Smith v. Apfel</u>, 167 F.3d 369, 375 (7th Cir. 1999); <u>see also</u> <u>Brenner v. Astrue</u>, 2008 WL

3925166, *7 (E.D. Mo. 2008); <u>Chisenhall v. Astrue</u>, 2008 WL 4423906, *7 (E.D. Mo. 2008). It is speculative that plaintiff will actually undergo the surgery, it is speculative that the surgery will proceed as planned, it is speculative that plaintiff will have a good surgical outcome, it is speculative that she will recover fully and suffer no complications, and it is speculative that surgery will leave her with the RFC that the ALJ described.

Plaintiff is entitled to an individualized determination of the effects of her condition. <u>O'Leary v. Schweiker</u>, 710 F.2d 1334, 1342 (8th Cir. 1983). A rotator cuff tear may affect one individual in an inconsequential manner, but cause disabling symptoms in another. <u>See</u> <u>Id.</u> While the Commissioner correctly notes that it is the claimant's burden to establish her RFC, it is well established that RFC is a medical question that must be supported by some medical evidence, and the ALJ should ensure that the record contains medical evidence that addresses the claimant's ability to function in the workplace. <u>Lauer</u>, 245 F.3d at 703-04. In the case at bar, the ALJ's RFC determination relies heavily upon an insufficient credibility determination and speculation, and lacks supporting medical evidence. The undersigned therefore concludes that the ALJ's RFC determination was not based upon substantial evidence on the record as a whole. On remand, the Commissioner should ensure that the record contains some medical evidence from a professional that addresses how plaintiff's impairments affect her ability to function in the workplace. <u>Id.</u>

C.   <u>Past Relevant Work</u>

Finally, plaintiff argues that substantial evidence does not support the ALJ's determination that she could return to her past relevant work, because the ALJ did not perform a function-by-function analysis of her past work as a small products assembler. In response, the Commissioner contends that, according to the Dictionary of Occupational Titles, plaintiff's past relevant work is performed at the light exertional level, and that plaintiff's RFC did not preclude any of the activities required by plaintiff's past relevant work.

At step four of the sequential evaluation process, the ALJ considers whether the claimant has the capacity to do her "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). In order for a claimant's past work to be considered "relevant" for such purposes, it "must have been done within the last 15 years, lasted long enough for the person to learn to do it, and constituted 'substantial gainful activity.'" <u>Reeder v. Apfel</u>, 214 F.3d 984, 989 (8th Cir. 2000) (citing 20 C.F.R. § 404.1565). The Regulations define "substantial gainful activity" as "work activity that involves doing significant physical or mental activities, even if done on a part-time basis, and work that is done for pay or profit, whether or not a profit is realized." <u>Id.</u> (citing 20 C.F.R. § 404.1572(a), (b)).

Because the undersigned has determined that the ALJ's credibility and RFC determinations are not supported by substantial evidence on the record as a whole, it is unnecessary to determine whether the ALJ properly related the RFC he determined to the

physical and mental of plaintiff's past work.  Upon remand, it will be for the ALJ in the first instance to do so, after properly assessing plaintiff's credibility and RFC.

Therefore, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's decision is reversed, and this cause is remanded to the Commissioner for further proceedings.

Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 12th day of August, 2011.